The Chicago, Rock Island and Pacific Railway
Company v. Hester A. Williams, *Administratrix.*

**No. 10829.**

1. Contributory Negligence—*not to be vigilant on approach-
ing railway crossing though company negligent in permit-
ting needless obstruction of view.* It is the duty of a traveler
on the highway, when about to cross a railroad, to make a vigilant
use of his senses to discover an approaching train, and this duty
still rests on him where needless obstructions to the view of the
track are negligently permitted by the railroad company to remain
on its right of way.

2. Special Findings of Jury—*in substantial conflict on vital
questions, verdict should be set aside.* Special findings of fact
returned by a jury are to be given so far as reasonably may be
that construction which will harmonize with the general verdict,
but where the special findings are in substantial conflict with
each other on vital questions in the case, the verdict should be set
aside and a new trial ordered.

Error from Doniphan District Court. R. M. Emery,
Judge. Opinion filed November 5, 1898. *Reversed.*

*M. A. Low* and *W. F. Evans,* for plaintiff in error.

*A. F. Martin* and *Grant W. Harrington,* for defend-
ant in error.

Allen, J.    John S. Williams was killed by an east-
bound freight train on the Chicago, Rock Island and
Pacific Railway in Doniphan County, on the eleventh
of June, 1890, at a crossing near the village of Denton.
This action is prosecuted by his widow, as adminis-
tratrix of his estate, to recover damages from the
Railway Company for negligently causing his death.
This is the second time the case has been brought to
this Court.    The decision in the first case is reported
in 56 Kan. 333.    Somewhat different questions are
now presented.    The deceased approached the rail-
road track from the north.    On the west side of the

highway, along which he was traveling, there was a high hedge extending as the jury found within from fifteen to twenty-four feet of the railroad track. Beyond this hedge was an apple orchard on the west side of which there was another hedge. The hedge was so high and dense as to effectually cut off all view of the approaching train until the deceased passed beyond the south end of it when his horses' heads were within a very short distance of the railroad track. Neither the testimony nor the findings of the jury definitely fix the precise point at which the deceased could have seen the approaching train. The right of way of the Railway Company was one hundred and fifty feet wide at the crossing, and the hedge was permitted by the Railway Company to remain at such height as to obscure all view of the track to the west of the crossing. Apple trees also were growing on the right of way.

The catastrophe happened on the morning of a calm and pleasant day. The deceased was driving his team attached to a lumber wagon, in which there were iron pipes and other things which made more or less noise. The freight train which killed him approached from the west at the rate of about twenty-five miles an hour. The negligence charged against the defendant lies in permitting the hedge to grow and remain on the right of way to such height as to cut off all view of an approaching train and in failing to give the crossing signal eighty rods from the crossing. The defendant charges contributory negligence on the part of the deceased in failing to take due precaution before driving on the track.

In answer to special questions the jury found that the hedge on the defendant's right of way was from eight to fifteen feet high ; that the Railway Company was negligent in permitting it to grow to such height

and density, and that such negligence contributed directly to the death of Williams ; that the defendant did not sound the whistle at the proper place for the crossing, and that it was negligent in failing to do so. The following are the questions and answers deemed most important :

" 38. When the horses were within eight feet of the track could the deceased by looking from his seat in the wagon have seen the approach of the defendant's train from a point near the whistling post one-fourth of a mile west of said crossing? A. No.

" 39. If the question last above is answered in the negative, how far could defendant's train have been seen by the deceased from such a position? A. About 200 feet.

" 41. Was the defendant's road straight at and for at least one-half mile east and west from said crossing? A. Yes.

" 43. What was there to have prevented the deceased from seeing train approach from the west after reaching a point from twenty to twenty-four feet north of said track? A. Hedge fence and bank of cut at west side of the orchard.

" 44. Was the bell of said engine rung when approaching said crossing? A. Yes.

" 49. How far west of the crossing was the engine when the fireman first discovered the team? A. 150 feet.

" 50. Was the deceased looking straight ahead while approaching said crossing, before he first saw the engine? A. Yes.

" 52. Did the deceased look or listen for the approach of the train while approaching said crossing, before the horses got on the track or before the train was within 50 or 60 feet of the crossing? A. Yes.

" 53. What precaution, if any, did the deceased' take on approaching said crossing to avoid the accident? A. He looked.

" 54. Was said Williams looking to the west as he approached said crossing at any time before the train was within 50 or 60 feet of where the accident occurred? A. Yes.

"55. Was said Williams looking straight ahead when approaching said crossing until the train was first discovered about 50 or 60 feet west? A. He was looking straight ahead until he turned and saw the train.

"57. Did said Williams stop his team on approaching the crossing and look or listen for an approaching train? A. No.

"59. Was there anything to prevent the deceased from hearing the approach of said train at any time before the deceased had reached said crossing after turning south on the north-and-south road leading to said crossing? A. Yes.

"60. State what there was to prevent the deceased from hearing the approach of said train if he had listened? A. Deadening of the sound by the presence of the hedge and orchard.

"61. What, if anything, did said Williams do to avoid the accident on approaching said crossing? A. Tried to whip up and get across.

"62. How far was said Williams from the approaching train when he first looked to the west and saw it? A. About 150 feet.

"63. Did said Williams look to the west for an approaching train as soon as he reached the south end of the hedge fence? A. No."

A general verdict in favor of the plaintiff for $2500 was returned on which judgment was entered.

The serious question presented is, whether the facts specially found are sufficient to overturn it. The culpable negligence of the defendant in two important particulars contributing directly to the injury being found by the jury, the only question remaining is whether contributory negligence on the part of Williams precluding a recovery is also found. The rule that a party about to cross a railroad must exercise care and caution commensurate with the dangers of the surroundings or suffer the consequences of his own rashness is founded in reason and has often been declared by this

1. One must be vigilant on approaching crossing.

court. Notwithstanding the negligence of the Railway Company in maintaining an obstruction to the view, it was still incumbent on the deceased to have regard for his own safety and to use his senses of sight and hearing to ascertain the approach of a train before attempt to go on the track. As to whether he did so, the special findings, viewed in the light of the testimony, are conflicting and contradictory.

There were but two eye witnesses of the occurrence who testified in the case, McNulty, who was riding in the wagon with Williams, and Castanien, the fireman on the engine of the train which killed him. According to the testimony of McNulty the actions of Williams indicated no knowledge on his part of the approach of the train until the horses were on the track when Williams tightened up his lines, and the collision followed almost instantly. Whether the defendant looked or listened for the approach of the train before that time McNulty could not state. Castanien, the fireman, testified that when the train was about a hundred or a hundred and fifty feet from the crossing he saw the team coming out from behind the hedge, and as the men in the wagon came in view it seemed like they were in conversation, and as they looked up and saw the train it seemed like they tried to get across ahead of it — snapped the lines to get across. The fireman immediately signaled the engineer to stop, and everything possible was done to stop the train but the collision occurred almost instantly.

In answer to the sixty-second question the jury say that Williams was about 150 feet from the approaching train when he first looked to the west and saw it, and in answer to the next question they say that he did not look to the west as soon as he reached the south end of the hedge. The last of these answers would seem based

2. Special findings in conflict with verdict, error.

on the testimony of McNulty, and the other on that
of the fireman.   Assuming that Williams could have
seen the approaching train when he was twenty-four
feet from the north rail the heads of his horses would
then be only twelve feet distant from it.   If the team
was moving at the rate of only three miles an hour
and the train at the rate of twenty-four the horses
would pass over the twelve feet in a little less time
than the train would move 150 feet, the distance the
jury say the train was away when Williams first saw
it.   All the evidence shows that the team did not
stop, and the jury so found.   This being true, under
the sixty-second finding, Williams, in order to see the
train 150 feet away must have looked just as he passed
beyond the end of the hedge, but in answer to the
next question they say pointedly he did not do so.   It
must be borne in mind that the team did not succeed
in crossing the track but was thrown back on the
north side of it.   The finding of the jury is that the
hedge fence extended " to within fifteen to twenty-four
feet of the track."   If the hedge concealed the train
until the deceased was within fifteen feet of the track
the heads of the horses would have been but a
step away from it.   Why the distance was so in-
definitely fixed is not apparent.   As to whether the
deceased listened as he approached the crossing the
implications of the special findings are to the effect
that he did not.   But it is exceedingly difficult to say
that there was a definite affirmative finding of failure
to listen when he should have done so.   In answer to
the fifty-ninth and sixtieth questions the jury say that
there was the deadening of the sound by the presence
of the hedge and orchard to prevent the deceased from
hearing the approach of the train ; and in answering
the fifty-third question as to what precaution the de-
ceased took on approaching the crossing they say he

looked. By the next preceding question, and also by the instruction of the court, the attention of the jury had been directly challenged to the duty resting on Williams to listen as well as to look. They found he did look but failed to find that he listened. In view of the rule that special findings are to be so construed as to harmonize with and uphold the general verdict where it can be done, we are unable to say that taken altogether the answers returned by the jury in this case amount to a direct finding that the deceased did not listen while approaching the track. We reach this conclusion with some hesitation. Were it not that the jury find that the whistle was not sounded eighty rods from the crossing and the defendant therefore guilty of neglecting to give the signal required by statute, and one which on a calm, clear morning would probably have been heard notwithstanding the obstructions to sound, there would seem to be little excuse for the deceased to drive on the track as he did without taking greater precaution for his safety.

On account of the conflicting findings bearing on the question of the contributory negligence of the deceased the judgment must be reversed and the case remanded for a new trial.