LAWSON MANN, *Appellee*, v. THE NORTHEAST KANSAS TELEPHONE COMPANY, *Appellant*.

No. 16,664.

JURY AND JURORS—*Special Findings and Verdict—Negligence—Injury to Traveler.* The defendant's team, which was hitched to a telephone pole upon the public highway, broke loose and ran away, running into and injuring the plaintiff, who was traveling upon the highway in a buggy. The plaintiff charged that the defendant was negligent in allowing its team to stand in the public highway without being securely fastened. The jury found specially that the team was tied in an ordinarily safe manner, and this and other findings were held to be inconsistent with the finding that the defendant was negligent, and a verdict for the plaintiff was improper.

Mann v. Telephone Co.

Appeal from Doniphan district court. Opinion filed October 8, 1910. Reversed.

*S. M. Brewster,* and *F. M. Pearl,* for the appellant.
*J. J. Baker,* for the appellee.

*Per Curiam:* This is an action to recover damages for a personal injury. The defendant is a telephone company whose telephone line occupied a part of the public highway. It had an employee whose duty consisted of traveling along the line with a team of horses and keeping the line in repair. This employee, upon the occasion of the alleged injury, tied his team to one of the telephone poles and climbed up to inspect the wire. The team broke loose and ran away, running into and injuring the plaintiff, who was traveling upon the highway in a buggy drawn by one horse. Upon a trial in the district court the jury returned a verdict for the plaintiff for $500, in which amount judgment was entered against the defendant, and it appeals.

It is alleged that the defendant was negligent and careless in allowing its team to stand in the public highway without being securely fastened. Upon the trial the jury returned seventy-one special findings of fact with the general verdict, as follow:

"(1) Ques. How long had defendant been the owner of the team of horses in question at the time of the accident to the plaintiff of October 3, 1908? Ans. On or about two years.

"(2) Q. How long had Jesse Schilling been in the employment of the defendant previous to the third day of October, 1908? A. Four years.

"(4) Q. Did Jesse Schilling exercise the care usually exercised by an ordinarily prudent man in the discharging of his duties while acting as a servant of the defendant on the third day of October, 1908? A. No.

"(5) Q. Do you find from the evidence that the team of horses owned by the defendant were by the said Jesse Schilling tied or hitched at the point where

he left them while he climbed the pole to repair the line? A. Yes.

"(6) Q. In tying said team (if he did tie them) did Jesse Schilling exercise that degree of care ordinarily exercised by a reasonably prudent man in the discharge of his duties and under the circumstances and surroundings as they existed? A. No.

"(7) Q. Do you find that the defendant's servant, Jesse Schilling, was guilty of negligence in the tying of the team of the defendant? A. Yes.

"(8) Q. If you answer the last preceding question in the affirmative, please state what his negligence consisted of. A. The opinion prevails that the horse became untied and it would have been better if both had been tied, knowing that the team was a runaway team.

"(11) Q. Could the plaintiff by the exercise and use of his eyes and ears have seen the team of the defendant approaching him from the rear, had he been looking and listening, in time to have avoided the accident? A. No.

"(12) Q. Did the plaintiff take any steps of precaution to avoid the accident? A. No.

"(13) Q. Could the plaintiff by the exercise of reasonable care have discovered the team approaching him in time to have avoided the accident or collision? A. No.

"(14) Q. Could the plaintiff in the exercise of reasonable care and caution have heard the defendant's team approaching him from the rear in time to have avoided being run down by it? A. No; not being in the habit of being run down by a team, he was not looking for it.

"(15) Q. What steps, if any, did the plaintiff take or what did he do, if anything, to avoid being run down by the defendant's team? A. None.

"(17) Q. What, if anything, was there to prevent the plaintiff in the exercise of reasonable care from hearing the defendant's team approaching him from the rear? A. The hard condition of the road and the rattle of his own buggy and the possible noise of the water wagon.

"(18) Q. What, if anything, was there to prevent the plaintiff in the exercise of reasonable care from seeing the defendant's team approaching him? A.

Mann v. Telephone Co.

The buggy top being raised and the curtain down and the direction that he was going.

"(19) Q. Could the plaintiff by the use of his faculties and the exercise of reasonable care have heard the defendant's team approaching him from the rear? A. No.

"(20) Q. Could the plaintiff in the exercise of his faculties and reasonable care have seen the defendant's team approaching him from the rear? A. Yes, if he had been looking backward.

"(21) Q. How far from where the accident occurred is it to the point where the defendant's team came in sight of the plaintiff? A. Eighty or ninety feet.

"(23) Q. Could not the plaintiff in the exercise of reasonable care have heard the defendant's team as it came downhill and approached him? A. No.

"(28) Q. Could the plaintiff have seen or heard the defendant's team approaching him had he exercised ordinary care and prudence? A. It was possible for him to have seen it, but not of heard it.

"(29) Q. If you answer the last preceding question in the negative, state what it was that prevented plaintiff from hearing or seeing defendant's team approaching him. A. There was nothing to prevent him from seeing had he been looking backward; the noise prevented him from hearing.

"(30) Q. What was the condition of the top of the plaintiff's buggy with reference to being raised or lowered at the time of the accident? A. The top was raised.

"(31) Q. If you find that the top of the plaintiff's buggy was raised at the time of the accident, how was it with reference to the rear curtain being up or down? A. It was down.

"(34) Q. Were the harness, lines and hitch reins used by defendant on its said team of horses in ordinary safe condition? A. Yes.

"(35) Q. Did Jesse Schilling, the servant of the defendant, hitch said team of horses at the point where he stopped to repair defendant's line? A. Yes.

"(37) Q. State, if you can, what caused the defendant's team to break its fastenings and run away? A. We do not know.

"(38) Q. Is it not a fact that under all of the cir-

cumstances and surroundings of this case that the plaintiff was injured by an accident that was practically unavoidable? A. No.

"(39) Q. If you find that the defendant was negligent in any way, state in what the negligence consisted. A. Not tying the team properly.

"(40) Q. If you find for the plaintiff, what amount do you allow him for medical attention? A. $4. (Four dollars.)

"(41) Q. If you find for the plaintiff, what amount do you allow him for medicine? A. Nothing.

"(42) Q. If you find for the plaintiff, what do you allow him for damages to his buggy? A. $35. (Thirty-five dollars.)

"(42½) Q. What amount (if anything) do you allow plaintiff for his pain, suffering and mental anguish? A. $461. (Four hundred and sixty-one dollars.)

"(43) Q. How long had Jesse Schilling been using the defendant's team previous to the accident on October 3, 1908? A. Two months.

"(44) Q. Is it not a fact that the defendant's team was on the day of this accident hitched in the same manner as was the custom of defendant's servants to do for more than a year previous to this accident? A. The custom and manner of tying the horses was apparently the same, but on this particular occasion there seemed to be a defect somewhere.

"(45) Q. Is it not a fact that it was ordinarily safe for defendant's servants to hitch its team in the manner that it was hitched on the day of the accident? A. Yes.

"(46) Q. Was the defendant's team accustomed to the use to which it was put on the 3d day of October, 1908? A. Yes.

"(47) Q. Was not the defendant's team accustomed to being hitched along the public highway in the manner that it was by the said Schilling on October 3, 1908? A. Yes.

"(48) Q. Was it not the habit of the servants of the defendant while repairing its lines along the public highway to hitch the team in question as was done by the said Schilling on the third day of October, 1908? A. Yes.

"(49) Q. Was it negligent in the servants of the defendant to hitch its team as it was hitched by the said Schilling on October 3, 1908? A. Yes.

"(50) Q. Had the defendant's team, while being used on the public highways as it was on October 3, 1908, ever broken the straps by which it was fastened and run away? A. No.

"(51) Q. Had the defendant's servants by reason of the surroundings at the place where the team was tied any cause or reason to believe that the team would become frightened and run away? A. Yes, the school-house being near, the largeness of the telephone pole, and the uneveness of the ground are all unfavorable conditions for the hitching of horses there.

"(52) Q. Do you find that there was anything unusual at the point where the defendant's team was hitched to cause its servants to believe that it was unsafe to hitch the team in the manner in which it was hitched by the said Schilling? A. Answer to No. 51 applies to 52.

"(55) Q. Did the horse which plaintiff was driving suddenly start and increase its gait a little prior to the accident? A. Yes.

"(56) Q. Was there anything out of the ordinary in front of the plaintiff to attract his attention? A. Yes.

"(57) Q. If the plaintiff's horse made an effort to increase its speed and pulled on the lines was not such conduct on the part of plaintiff's horse sufficient to admonish plaintiff that something was approaching him from the rear? A. Yes.

"(58) Q. Could not the plaintiff after his horse had suddenly increased its speed have discovered the approach of defendant's team in time to have avoided the accident? A. No.

"(60) Q. Was not the action and conduct of plaintiff's horse sufficient to inform the plaintiff that something was approaching him from the rear? A. Yes.

"(61) Q. Was not the road at the time and place where this accident occurred hard and dry? A. Yes.

"(63) Q. Was the plaintiff an experienced horseman and well acquainted with the habits of horses when being approached from the rear by other horses? A. Yes.

"(67) Q. Was not this what might be termed an unfortunate accident for which no one is really chargeable with negligence? A. No.

"(68) Q. Was there anything in the surroundings at the place where defendant's team was tied from

which an inference can be drawn that a man of ordinary prudence could reasonably believe that injury might result from his act?  A.  Yes.

"(69) Q. If you answer question No. 68 in the affirmative, state what there was from which defendant's servant could reasonably infer that injury would result. A.  Answer to 51 applies to 69.

"(70) Q. Was the place where defendant's team was hitched free from the presence of anything which could be supposed to frighten a team accustomed to be left in that condition on the public highway?  A.  Anwer to 51 applies to 70.

"(71) Q. Was the plaintiff guilty of contributory negligence?  A.  No."

It is contended that these special findings of fact are so inconsistent with the general verdict and with themselves as to be insufficient to sustain the verdict, and that the verdict should have been set aside and a new trial granted.  We agree with this contention.  The special findings of fact show that the team was tied in an ordinarily safe manner on the day in question, and this, together with other answers, is inconsistent with the finding of negligence.  Upon these facts no verdict for the plaintiff would be proper.  (*Harvester Works Co. v. Cummings,* 26 Kan. 367; *St. L. & S. F. Rly. Co. v. Shoemaker,* 38 Kan. 723; *Kansas City v. Brady,* 52 Kan. 297, 53 Kan. 312; *Anderson v. Pierce,* 62 Kan. 756; *Railway Co. v. Williams,* 59 Kan. 700; *Stanley v. Railway Co.,* 78 Kan. 87.)

The judgment is reversed and a new trial awarded.